Edward A. **HEDMAN**, Bruce W. Hubbard, Jr., and the Richardson Company, Plaintiffs,

v.

**COMMISSIONER OF PATENTS** of the United States, Defendant.

Civ. A. No. 728-64.

United States District Court
District of Columbia.

March 2, 1966.

ceive a patent for the invention specified in Claims 1–20, inclusive, of application Serial No. 796,771 entitled "Alfin Catalyst Copolymerization", filed March 3, 1959, by plaintiffs Edward A. Hedman and Bruce W. Hubbard, Jr., and assigned to co-plaintiff The Richardson Company. The application in suit is a continuation-in-part of application Serial No. 727,057, filed April 8, 1958, now abandoned.

Plaintiffs' invention is directed to Alfin catalyzed copolymerization of either butadiene-1,3 or isoprene with butene-2, which reaction produces relatively high molecular weight copolymers.

Claims 1 and 10 are illustrative of the invention and read as follows:

1. The copolymerization product of a conjugated unsaturated diolefin selected from the class consisting of butadiene-1,3 and isoprene with butene-2 having a minimum dilute solution viscosity of between about 3–6.

10. The method of making a high molecular weight polymer which comprises reacting a conjugated unsaturated diolefin selected from the class consisting of butadiene-1,3 and isoprene with butene-2 in the presence of an Alfin catalyst selected from the class consisting of: (1) a mixture of an alkali metal alkenyl, alkoxide and halide, and (2) a mixture of an alkali metal benzyl, alkoxide and halide.

The three references relied upon by the Patent Office tribunals in rejecting plaintiffs' claimed subject matter as obvious and unpatentable over the prior art under 35 U.S.C. § 103 are as follows:

George R. Jones, Beale & Jones, Washington, D. C., John L. Hutchinson, Melrose Park, Ill., John D. Dewey, Greist, Lockwood, Greenawalt & Dewey, Chicago, Ill., for plaintiffs.

Joseph Schimmel, Acting Sol., Washington, D. C., Fred W. Sherling, Washington, D. C., of counsel, for defendant.

JACKSON, District Judge.

This is a civil action under 35 U.S.C. § 145 in which plaintiffs seek an adjudication that they are entitled to re-

Goodrich-Gulf (Belgium)   543,292   June 2, 1956

Rokityanskii, I. V., Polymerization of Mixtures of 1,3-Butadiene with 2-Butene and with Pentane by Sodium. In Nat.Petroleum News. Vol. 37, pages R133–R136.

Morton, A. A., The Alfin Catalysts. In J.A.C.S. Vol. 69, pages 950–961. April 1947.

A fourth reference was introduced in evidence at the trial, but defendant's brief states that Carlson et al. U. S. Patent No. 3,135,725 "is in no way relied upon to reject plaintiffs' claims."

All of Claims 1–20 have been rejected by the Patent Office tribunals as unpatentable over Morton in view of Rokityanskii. However only product Claims 1–9, but not process Claims 10–20, have been rejected by the Patent Office as unpatentable over the Goodrich-Gulf Belgian patent.

Goodrich-Gulf broadly discloses *inter alia* the copolymerization of conjugated polyolefins with aliphatic monoolefins, and in particular this Belgian patent states that "the conjugated diolefin hydrocarbon may be a 1,3-butadiene hydrocarbon such as 1,3-butadiene (which is the simplest conjugated diolefin) or a methyl-substituted 1,3-butadiene, i. e., isoprene or piperylene."

The reference also broadly discloses that "the other hydrocarbon" which is copolymerized with the conjugated polyolefin "may be an aliphatic monoolefin such as ethylene, propylene, 1-butene, 2-butene, * * *."

With regard to the high molecular weight polymers obtained by Goodrich-Gulf, this Belgian patent states that "polymer products obtained by this method are generally resinous or rubbery materials ordinarily of substantially linear structure and of high molecular weight, i. e., a molecular weight usually higher than 5,000, normally higher than 10,000, and even occasionally rising to a value of 1,000,000 or more." Plaintiffs' isoprene/butene-2 copolymers have an average viscosity molecular weight of approximately 750,000.

Among the 132 specific examples of Goodrich-Gulf, examples 90 and 91 are particularly pertinent, since these two examples both show the copolymerization of isoprene with 2-methyl-2-butene. The copolymer products formed are said to be "rubbery, vulcanizable and adhesive materials." Since 2-methyl-2-butene is a next adjacent higher homologue of 2-butene it is reasonable to conclude that 2-butene should also be copolymerizable with isoprene and also with plaintiffs' other claimed conjugated diolefin, 1,3-butadiene, in light of the teachings of the Goodrich-Gulf reference relating to Ziegler catalyzed copolymerization.

Heterogeneous catalysis such as that of the Ziegler systems of Goodrich-Gulf and the Alfin systems of Morton is known to be a surface phenomenon. Thus, while it might be difficult to make a prediction in light of examples 90 and 91 of Goodrich-Gulf as to whether higher homologues such as 2-ethyl-2-butene and 2-n-propyl-2-butene would be copolymerizable with either isoprene or butadiene, it is reasonable to predict that 2-butene itself, which is a next adjacent lower homologue of 2-methyl-2-butene and therefore has a smaller monomeric molecular configuration, should be copolymerizable with both isoprene and 1,3-butadiene, at least in the presence of the Ziegler catalysts of Goodrich-Gulf.

Although the Goodrich-Gulf Ziegler catalysts and the Morton Alfin catalysts are both heterogeneous coordinated anionic organometallic systems, it would be difficult for an ordinarily skilled chemist to make a reasonable prediction in light of Goodrich-Gulf as to whether butene-2 would be copolymerizable with isoprene or butadiene in the presence of an Alfin catalyst system. The Ziegler catalysts are mixtures of organometallic compounds, at least one of which must be a heavy metal compound. The Alfin catalysts on the other hand are mixtures of organoalkali metal, usually organosodium, compounds with at least one inorganic alkali metal compound, usually sodium chloride. Since sodium and potassium are alkali metals, not heavy metals, it would be quite difficult to extend the Goodrich-Gulf disclosures relating to Ziegler catalysts to the Alfin catalysts of Morton which are used by plaintiffs. However, the Court notes that plaintiffs' copolymer product Claims 1–9 presently contain no catalyst limitations. In the total absence of such catalyst limitations, product Claims 1–9 cover the Ziegler catalyzed copolymers of

Goodrich-Gulf just as much as these product claims cover the Alfin catalyzed copolymers of Morton. Therefore, the Court agrees with defendant and the Patent Office tribunals that the claimed subject matter of plaintiffs' Claims 1–9, namely, a high molecular weight copolymerization product of either 1,3-butadiene or isoprene with butene-2, would have been obvious at the time plaintiffs' invention was made to an ordinarily skilled chemist in view of the specific disclosures and suggestions of the Goodrich-Gulf Belgium patent.

Before proceeding to the second ground of rejection, two other things might be mentioned. First, the Court notes without comment that generic product Claim 1 as originally filed specified that "the copolymerization product" was that formed "in the presence of an Alfin catalyst," which catalyst limitation was subsequently cancelled from the product claims, but not the process of manufacture claims, by plaintiffs' first prosecution amendment. Second, with regard to the time plaintiffs' invention was made, an attempt was made at the trial to establish a date of invention by alleged actual reduction to practice in December, 1956. However, no utility testing is shown in the laboratory notebook entries for that date submitted in evidence, and it was still "questionable" as late as July 22, 1957 whether a copolymer of butadiene with butene-2 had even been formed, the strong possibility existing that merely a mixture of homopolymers had been obtained from the reaction. Therefore, the Court finds that plaintiffs' date of invention is April 8, 1958, the filing date of the parent application.

All of plaintiffs' Claims 1–20, inclusive, have been rejected as unpatentable over Morton in view of Rokityanskii. The Morton article, which was published in the April, 1947 issue of the Journal of the American Chemical Society, discloses the Alfin catalyst system and its use in the polymerization of butadiene and isoprene. Testimony at the trial established the fact that, prior to the time plaintiffs made their invention, the Alfin catalyst system was known to be useful not only for homopolymerization, but also for copolymerization of butadiene and isoprene with each other and with the terminal monoolefin styrene. Although Morton's teachings indicate that the Alfin catalyst system is highly specific to the polymerization of butadiene and isoprene, these teachings may reasonably be extended to suggest copolymerization of butadiene and isoprene with terminal monoolefins other than styrene, for example, butene-1, which is an isomer of butene-2 differing only by the position of the single double bond. In other words, Morton's teachings alone may reasonably be extended to suggest copolymerization of butadiene and isoprene with terminal monoolefins and with other comonomers known to be readily homopolymerized. In this regard the Court defines the "copolymerization" suggestion of Morton in the strict sense of the word to mean the combination of two or more different comonomers, each of which is capable of polymerizing alone. Both butene-1 and styrene are known to be readily homopolymerized, as are some other terminal monoolefins. On the other hand, the Court does not consider the teachings of Morton alone to suggest that type of copolymerization known as "heteropolymerization," the latter word being defined as additive copolymerization involving one substance which is unsaturated, but which does not readily polymerize alone. Since butene-2 and other internal monoolefins are known to be difficultly polymerizable, and not polymerizable at all in the presence of some catalyst systems, plaintiffs' claimed copolymerization is believed to be more precisely described as a heteropolymerization reaction, which is not taught or suggested by Morton alone. However, the Patent Office rejection of Claims 1–20 is not solely based on the Morton article, but rather is based on the combination of the Morton and Rokityanskii articles.

The Rokityanskii article published in the February 7, 1945 issue of National Petroleum News discloses polymerization

of mixtures of 1,3-butadiene with 2-butene and with pentane by sodium. In particular, Rokityanskii stated that " * * * 2-butene acts as an agent limiting the growth of the polymer chains and partly participates in the formation of polymers." Trial testimony conclusively establishes the fact that Rokityanskii discloses the use of 2-butene as a telogen or chain transfer agent which is used to limit the chain lengths of the 1,3-butadiene homopolymer chains. Thus it is clear that the reaction disclosed by Rokityanskii between butadiene and 2-butene is not a copolymerization but rather a telomerization reaction, and that the product formed is more analogous to an end-capped homopolymer than to a copolymer.

Since the product of plaintiffs' Claims 1–9 is specified to be a "copolymerization product," the Court will not sustain the Patent Office rejection of these product claims as unpatentable over the combination of references, the rejection being based on the clearly erroneous views of the Patent Office Examiner and Board of Appeals that Rokityanskii discloses copolymerization rather than merely a telomerization reaction.

With regard to plaintiffs' process Claims 10–20 on the other hand, the Court notes that the expression "method of making a high molecular weight polymer which comprises reacting * * *" covers any and all types of reactions between either butadiene or isoprene and butene-2 in the presence of an Alfin catalyst wherein "a high molecular weight polymer" is formed. In contrast to "copolymerization product" Claims 1–9, process Claims 10–20 therefore cover any Alfin catalyzed polymerization reaction between 1,3-butadiene and butene-2, regardless of whether that reaction is a copolymerization, a heteropolymerization, an end-capped homopolymerization, or a telomerization reaction. In view of the undue breadth and indefiniteness of Claims 10–20, the Court finds that these process claims were fairly and properly rejected as unpatentable over Morton in view of Rokityanskii.

The question has also arisen as to the propriety of combination of these two reference articles in view of the alleged lack of suggestion in either article that their teachings can be combined. Both articles relate to the polymerization of butadiene, and the term "polymerization" certainly covers copolymerization as well as homopolymerization. Although the catalyst of Rokityanskii is stated to be metallic sodium, trial testimony established the fact that Rokityanskii's true catalyst is an organosodium compound formed by reaction of the metallic sodium with one of the monomers. Since two of the three components of an Alfin catalyst system may be organosodium compounds, the third component being an inorganic sodium compound, the Court finds that there is a sufficiently close relationship between the Alfin catalyst of Morton and the sodium catalyst of Rokityanskii that the teachings of the articles may properly be combined, especially since both articles relate to the polymerization of 1,3-butadiene.

Two of the known major advantages of the Alfin catalyst system consist in the rapid reaction rates and the high molecular weight polymers produced by that system. An ordinarily skilled chemist desiring to overcome the two deficiencies of the Rokityanskii method, which produces liquid, relatively low molecular weight polymers at slow reaction rates, would naturally be led to substitute Morton's Alfin catalyst for Rokityanskii's sodium catalyst with the reasonable expectation that such substitution of catalysts would lead to the formation of rubbery relatively high molecular weight polymers of 1,3-butadiene and 2-butene at rapid reaction rates as disclosed by Morton. While an ordinarily skilled chemist would likewise expect the polymerization reaction to be a telomerization as disclosed by Rokityanskii, the Court has previously mentioned the fact that plaintiffs' process Claims 10–20 have not been limited to exclude telomerization reactions between butadiene or isoprene with butene-2 in the presence of the Alfin catalyst.

Since the scope of Court review in a civil action under 35 U.S.C. § 145 is limited by statute to the "claims involved in the decision of the Board of Appeals," the Court must sustain the Patent Office rejection of process Claims 10–20, but not "copolymerization product" Claims 1–9, as unpatentable over Morton in view of Rokityanskii under 35 U.S.C. § 103, since the subject matter of the process claims would have been obvious at the time plaintiffs' invention was made to an ordinarily skilled chemist.

Plaintiffs' arguments for patentability of Claims 1–20 over the three references relied upon by the Patent Office appear to the Court to rest on two basic contentions, first, that there is little or no predictability in chemistry, and second, that the expressions "subject matter sought to be patented" and "subject matter as a whole" in 35 U.S.C. § 103 should be interpreted to mean the subject matter disclosed in an applicant's specification, as distinguished from the claimed subject matter.

With regard to the first contention, numerous leading chemists from all over the world have sought to persuade this Court in several civil actions under 35 U.S.C. § 145 that there is little or no predictability in polymers, dyestuffs, pharmaceuticals, and other areas of chemical inventions. Notwithstanding such testimony, the Court is convinced of the scientific fact that there is indeed a considerable amount of predictability in chemistry. The citation of numerous known exceptions to the general rules of chemistry has not convinced the Court that these general rules do not even exist. For example, when a certain chemical reaction is known to proceed at a specific reaction rate when the process is conducted at 100°C., an ordinarily skilled chemist would probably not be surprised by a discovery to the effect that the reaction proceeds either more rapidly at 110°C., or more slowly at 90°C. Likewise, when a prior art compound is known to possess a certain property or to react in a certain fashion, the discovery by a chemist that a position isomer or next adjacent homologue of the prior art compound possesses the same property or reacts in a similar fashion would probably evoke no more than a polite nod from the chemist's ordinarily skilled colleagues. While utmost care must be exercised by chemical patent examiners and other ordinarily skilled chemists in making predictions based on the general rules of chemistry, on the ground that even the most reasonable predictions in this science often turn out to be wrong, this factor should not preclude "a person having ordinary skill in the art" of chemistry from making reasonably based predictions on the basis of prior art knowledge.

With further regard to this alleged lack of predictability, little sophistication is required to distinguish between the undeniably true statement that there is no absolute predictability in chemistry on the one hand, and the erroneous statement that there is absolutely no predictability in chemistry on the other hand. An unequivocal holding to the effect that there is no predictability whatsoever in the science of chemistry would completely eliminate the obviousness test of 35 U.S.C. § 103 from consideration in determining the patentability of claimed chemical inventions. If there is no predictability in chemistry, then no new chemical invention would ever have been obvious at the time it was made to an ordinarily skilled chemist, and it would logically follow that any new and useful chemical invention would be patentable. Such elimination of the obviousness test of 35 U.S.C. § 103 in determining the patentability of chemical inventions would be quite contrary to statute law and to the clear intent of Congress in enacting Section 103 that the test should be applied in determining patentability of every "invention," whether chemical, mechanical, or electrical.

With respect to plaintiffs' second major argument for patentability, 35 U.S.C. § 103 reads in part as follows:

"A patent may not be obtained * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

■ It should be quite clear that the antecedent of "subject matter as a whole" is "subject matter sought to be patented," which expression refers to the *claimed* subject matter, as distinguished from subject matter which is merely disclosed in an applicant's specification but not included in the claims. While an applicant for a patent must include all essential limitations in his claims in order to comply with 35 U.S.C. § 112, the applicant may elect to include nonessential limitations or not as he sees fit. However, when an applicant for a patent chooses not to include certain limitations in his claims during prosecution in the Patent Office, thereby insisting upon the allowance of claims of relatively broad scope, the applicant cannot reasonably expect the Court to read these missing limitations into his claims whenever these limitations prove to be necessary for the purpose of distinguishing the *claimed* subject matter from the prior art references relied upon by the Patent Office.

■ As previously mentioned, plaintiffs' product Claims 1–9 have not been limited either to exclude Ziegler catalyzed copolymerization products or to include only Alfin catalyzed copolymerization products. The Court therefore holds the subject matter of product Claims 1–9 to be obvious and unpatentable over Goodrich-Gulf under 35 U.S.C. § 103. Likewise, plaintiffs' process Claims 10–20 have not been limited either to exclude telomerization or to include only copolymerization or heteropolymerization. The Court holds, therefore, that the subject matter of process Claims 10–20, but not

product Claims 1–9, is obvious and unpatentable over Morton in view of Rokityanskii under 35 U.S.C. § 103. Plaintiffs are not entitled to a patent containing any of Claims 1–20 and their Complaint should be dismissed.

This Opinion includes Findings of Fact and Conclusions of Law.