**NATIONAL DISTILLERS & CHEMICAL CORPORATION, and Harry Greenberg, Plaintiffs,**

v.

**Edward J. BRENNER, Commissioner of Patents, Defendant.**

**Civ. A. No. 2673–64.**

United States District Court
District of Columbia.
May 10, 1966.

A. Yates Dowell, Jr., Washington, D. C., for plaintiffs.

Joseph Schimmel, Sol., Fred W. Sherling, Washington, D. C., of counsel, for defendant.

JACKSON, District Judge.

This is a civil action under 35 U.S.C. § 145 to obtain a patent. Upon review of all the evidence in the record plus the briefs of counsel, the Court finds against the defendant and for plaintiff, which is entitled to receive a patent for the invention specified in Claims 13 to 16 of Greenberg application Serial No. 722,-655, filed March 20, 1958, entitled "Olefin Polymerization Process and Catalyst Therefor."

Defendant's Brief cites only one case as a legal precedent, and that case is readily distinguished on its facts. In Oberholtzer v. Ladd, 223 F.Supp. 84 (D.C. D.C.1963), affirmed 143 USPQ 336 (D.C. Cir. 1964), this Court held that evidence of an unexpected result is immaterial where the *claimed* subject matter is obvious. However, Findings of Fact Nos. 13, 17, 22, and 30 in the *Oberholtzer* cases clearly show that the claims in suit were so broad as to read on, not only the subject matter specifically disclosed in the applications in suit, but also subject matter that was either taught or clearly suggested by the prior art. The fact that evidence of an unexpected beneficial result was material with respect to claims commensurate in scope with the disclosed subject matter is shown in Finding No. 13, wherein it is stated that five such claims were properly allowed by the primary examiner and consequently never reached this Court.

In the present case, in contrast to the *Oberholtzer* cases, the patentable novelty is clearly set forth in the claims as being the use, in the known process for preparing high density polyethylene, of an improved two-component catalyst system "consisting essentially of" (which claim limitation excludes the possible presence of an activator or promoter as a third component) a finely divided sodium dispersion having a critical maximum particle size of 3 microns, and titanium tetrachloride.

In holding the claimed subject matter to be unobvious and patentable, the Court has followed the standards recently set forth (in connection with the interrelated issues of obviousness and criticality) by the Court of Appeals for this Circuit in California Research Corp. et al. v. Ladd, 356 F.2d 813 (D.C. Cir. 1966). Pursuant to Rule 52(a), Federal Rules of Civil Procedure, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. This is an action brought pursuant to 35 U.S.C. § 145, praying this Court to adjudge that plaintiffs are entitled to receive a patent with four claims which were finally rejected by the Board of Appeals of the United States Patent Office.

2. The applicant is plaintiff Harry Greenberg, an employee of plaintiff National Distillers & Chemical Corporation at the time of his invention. The application, Serial No. 722,655, filed March 20, 1958, entitled "Olefin Polymerization Process and Catalyst Therefor", is assigned to plaintiff corporation. The application is a continuation-in-part of copending application Serial No. 577,958, filed April 13, 1956, now abandoned, having the same title as the present application. The specification and claims define a process of polymerizing ethylene utilizing a novel polymerization catalyst of which the novel ingredient is finely divided sodium, the particles of which are not substantially in excess of about 3 microns in diameter.

3. Claim 13 is illustrative and reads as follows:

13. A polymerization process consisting essentially of polymerizing ethylene at a temperature of from about –20°C. to about 150°C. at a pressure of from about 25 to about 500 pounds per square inch with a polymerization catalyst consisting essentially of finely divided sodium, the particles of which are not substantially in excess of about 3 microns in diameter and titanium tetrachloride.

Claims 14 to 16 are dependent on Claim 13.

4. Applicant Harry Greenberg testified as to the experimental work which resulted in his accidentally discovering the process upon which the application in suit is based:

(1) Dr. Greenberg testified that in 1954 Professor Ziegler, in Germany, made a startling announcement about a new organometallic catalyst system for making high density polyethlyene.

(2) The Ziegler system involved the use of room temperature and atmospheric pressure, whereas previous systems for making low density polyethylene required pressures of the order of 25,000 to 30,000 pounds per square inch and temperatures of 200 to 250 degrees Centigrade.

(3) Plaintiff company was, at the time of the Ziegler announcement, involved in the polyethylene field and desired to engage in a program that did not conflict with that of Professor Ziegler because of the tremendous commercial potential.

(4) Plaintiff company thereupon instituted a research program seeking the development of a new catalyst system in which sodium was an ingredient, plaintiff company also being a manufacturer of sodium.

(5) After about a year was spent by other research personnel of plaintiff company in the research program, the applicant, an employee, was invited to direct his attention to such development.

(6) Among the experiments carried out by applicant was a series involving naphthalene, sodium dispersions and titanium tetrachloride ($TiCl_4$) in a three component catalyst system.

(7) In order to carry out experiments, applicant requested and received, from time to time, sodium dispersions from the laboratory of plaintiff company.

(8) Applicant did not specify the particle size for such sodium dispersions. For the series of experiments

which led to applicant's claimed discovery, applicant was supplied with a quantity in which the maximum particle size was about 3 microns, such dispersion being available due to the plaintiff company's work in connection with sodium dispersions.

(9) Applicant carried out a series of experiments to determine the optimum amount of naphthalene, and when this reached a point where the naphthalene was omitted entirely, applicant found to his surprise that the resulting catalyst system was still as effective as when the naphthalene had been used in applicant's attempts to prepare an organosodium compound.

(10) A further experiment indicated that no polymerization resulted if a sodium dispersion of 6 to 15 microns was employed, in which the average particle size was approximately 9 microns.

(11) A later series of experiments established that the significant reactivity to $TiCl_4$ of sodium dispersions commenced with a dispersion having a maximum particle size of approximately 5 microns and reached greatly increased magnitude when the dispersion reached a maximum particle size of approximately 3 microns. Experiments in which the maximum particle size was 35 microns and the average size was 15 microns indicated zero activity. There was no experimental data during that series of experiments for particle sizes in the intermediate range from above 5 to 35 microns, but a prior experiment had shown zero activity with a maximum particle size of 15 microns and an average of 9 microns.

5. The Primary Examiner, after earlier rejections on other prior art, finally rejected the claims as unpatentable over Anderson II in view of Anderson III and Cash, Jr., and a publication, Principles of Chemical Engineering. The Board of Appeals added as references Crouch I, Crouch II and Pilar et al. and made two new rejections, all based on 35 U.S.C. § 103. In a second final rejection, which followed an amendment submitted in response to the Board's rejection under Rule 196(b), the Examiner relied upon all of the patents and publications named and added a reference, Webster's New International Dictionary. A total of thirteen references were cited during the prosecution. The Board of Appeals once again affirmed the Examiner.

6. The eight references finally relied upon by the Primary Examiner and the Board of Appeals and by the Solicitor at the trial are as follows:

| | | |
|---|---|---|
| A—Anderson et al II | | 2,879,263 |
| B—Anderson et al III | | 2,905,645 |
| C—Cash | | 2,912,424 |
| D—Crouch I | | 2,483,886 |
| E—Crouch II | | 2,483,887 |
| F—Pilar et al | | 2,881,156 |

G—"Principles of Chemical Engineering" by Walker, Lewis & McAdams, McGraw Hill Book Co., 2nd Ed. 1927 (Page 273).

H—"Webster's New International Dictionary", 2nd Ed., unabridged. (G. C. Merriam Company)

7. At the trial defendant's counsel indicated that he would rely primarily upon either of the Anderson patents combined with either of the Crouch patents.

8. Anderson II (filed February 1, 1955) is assigned to E. I. duPont de Nemours & Company. The patent discloses a three-component catalyst system for polymerizing ethylene in which sodium, $TiCl_4$, and an unsaturated hydrocarbon activator are included. The patent teaches the necessity, as a matter of commercial practice, of using an activator; otherwise it states that polymerization is "sluggish." The results stated in the patent indicate that very little polymer is yielded in the absence of the activator, e. g. only about one-ninth as much as in the presence of the propylene activator of Example I.

9. Anderson III (filed August 16, 1954), and assigned to the same assignee as in Anderson II, discloses and claims the use of an organometallic reducing agent. The 19 examples list various re-

ducing agents, including phenyl lithium, phenyl magnesium bromide, and others, but does not specifically list sodium. The patent states generally that "zinc metal and metals above zinc in the electromotive series" may be used as reducing agents for $TiCl_4$. While sodium is not specified in the patent, it is known to be a metal above zinc in the electromotive series. The absence of any specific mention of sodium in Anderson III and the teaching in the later filed Anderson II case of the necessity, as a practical matter, of using an activator indicate that Anderson et al. did not contemplate or suggest applicant's specific catalyst system. The statement in the patent that "good results are obtained when the catalyst is colloidally dispersed" refers to the ultimate catalyst $(TiCl_2)$ and not to any of its components $(TiCl_4$ and a reducing agent) which react to produce such catalyst.

10. Cash, Jr., assigned to Eastman Kodak Co., discloses the use of a three component catalyst system including powdered aluminum, titanium tetrachloride, and a nitrogen-containing (tetra substituted ammonium) compound, the latter serving as an activator.

11. Crouch I, assigned to Phillips Petroleum Co., is directed to the preparation of a catalyst for the polymerization of a conjugated diene. The patent specifies the use of sodium particles of 10 to 20 microns as a catalyst. The problem of polymerizing a conjugated diene is not related to that of polymerizing ethylene.[1]

12. Crouch II, like Crouch I, is concerned with the polymerization of a conjugated diolefin. In that patent sodium having a particle size of 10 to 20 microns is employed together with a mercaptan as an activator.

13. Pilar et al., assigned to Standard Oil Co. of Indiana, like Anderson II, discloses a three-component catalyst system including sodium, titanium tetrachloride and a carbonyl compound, the latter functioning as an activator or promoter.

14. Neither the Anderson II patent nor the Pilar et al. patent discloses the size of the sodium particles employed. The conventional particle size of sodium that was used before the plaintiffs' invention was 10 to 50 or 60 microns.

15. "Principles of Chemical Engineering" states the well known principle that reduction of the size of particles of a solid increases the surface area exposed and the rate of reaction when subjected to a chemical change.

16. The Webster's "New International Dictionary" reference defines a "colloid" as "any substance in a state of fine subdivision or dispersion, with particles ranging between $10^{-5}$ and $10^{-7}$ cm (0.1 to 0.001 microns) in diameter, as colloidal gold, lead, sulphur, etc."

17. The disclosure in Anderson II that a small amount of polymer can be obtained without the use of an activator (about one-ninth the amount of yield with an activator) does not suggest the use of a sodium dispersion in which the particles are of a critical specific size range from which a vastly increased yield can be obtained, even without an activator. The evidence supports applicant's view that this is a critical difference in kind and not in degree.

18. The statement in Anderson III that "good results are obtained when the catalyst is colloidally dispersed" refers to the reaction product (i. e. the ultimate $TiCl_2$ catalyst) of the catalyst ingredients and not to its components ($TiCl_4$ and a reducing agent) and does not suggest the use of sodium as a component of a two-component catalyst system in which the particles are of the critical size claimed.

19. The disclosure in the Crouch I patent of using sodium per se of a par-

1. Plaintiff's expert witness Dr. Gaylord testified in this respect that "the polymerization of a conjugated diene, such as butadiene, was known for at least fifty years before anyone discovered how to polymerize ethylene due to the extreme difficulty in doing so." Cf. Hedman et al. v. Commissioner, 253 F.Supp. 515 (D.C.D.C.1966), a case involving the polymerization of conjugated dienes, wherein Dr. Gaylord was also one of plaintiffs' expert witnesses.

ticle size from 10 to 20 microns as a catalyst for polymerizing a conjugated diene does not suggest the use of a sodium dispersion of the three micron maximum particle size claimed by applicant in a catalyst system for polymerizing ethylene, a monoolefin.

20. The broad statement in Anderson III that "zinc metal and metals above zinc in the electromotive series" may be used as reducing agents for titanium tetrachloride is not a suggestion that a sodium dispersion having the critical particle size claimed be used.

21. Pilar et al., either alone or combined with Crouch, is no more pertinent than Anderson II, as discussed above.

22. The patents to Anderson et al. and Pilar et al. both teach that the use of an activator or promoter is necessary for commercially successful polymerization of ethylene.

23. Applicant's witness Karl Koch testified that plaintiff company is a manufacturer of sodium metal and was constantly attempting to extend and investigate uses of sodium, particularly sodium dispersions. He testified that he personally performed experiments which demonstrated the unexpected activity (52 to 80%) to $TiCl_4$ of a sodium dispersion in which the maximum particle size is approximately 3 microns. In contrast, a dispersion with 4 micron maximum particle size, 2.5 micron average size, produced only 18% activity to $TiCl_4$.

24. Plaintiffs' witness Dr. Norman G. Gaylord is an eminent authority in the field of polymer chemistry. Dr. Gaylord, a research associate of DuPont at the time of the Anderson et al. work in 1954–1955, testified that the teachings of the prior art in 1956 would not have led an ordinary research chemist to make the discovery disclosed and claimed in the present application. He testified that the prior art indicates that, if one wishes to use a finely divided sodium dispersion as part of a catalyst system, an activator is required; and therefore the prior art would not have led an ordinarily skilled chemist to attempt to use any finely di-

vided sodium dispersion without an activator. Dr. Gaylord pointed out on cross-examination that the minimal result obtained according to the prior art in the absence of an activator is merely "an interesting laboratory curiosity", but would not be commercially usable. Dr. Gaylord stated that if one followed the prior art teachings without an activator, "instead of 25 cents a pound the product would cost 25 dollars a pound".

25. The references and the testimony indicate that Dr. Ziegler's discovery of a low pressure and temperature process for polymerizing ethylene in 1954 generated much activity seeking other processes and catalysts, including research by the DuPont Company, the assignee of the Anderson II and III patents, and Standard Oil Company of Indiana, the assignee of Pilar et al. Plaintiff company likewise became interested and began a research program which was carried on by other personnel for approximately a year before applicant became involved in it.

26. The numerous working examples of Anderson II, Anderson III and Pilar et al. are an indication of the extensiveness of the work that was being done in the field and of the unobviousness of applicant's discovery. Manifestly, Anderson et al. and Pilar et al. did not discover plaintiffs' invention, as both groups stressed the necessity, as a practical matter, of using an activator or promoter as a third component.

27. Whereas the prior art teaches the necessity, as a matter of commercial practice, of adding an activator as an ingredient to the sodium dispersion-titanium tetrachloride ethylene polymerization catalyst system, applicant's two-component system omits any activator in such system and obtains vastly increased yields over those disclosed as obtained by the prior art both with (two and one-half to seven times as much) and without (twenty to forty times as much) an activator.

28. The discovery of the unexpected reactivity of the claimed critical particle size sodium dispersion to $TiCl_4$ for producing the ultimate polymerization cata-

lyst (TiCl$_2$) without an activator was not obvious to those of ordinary skill in the polymer art at the time of plaintiffs' invention.

### CONCLUSIONS OF LAW

1. The claims in suit define a new and useful process of polymerizing ethylene utilizing a novel two-component polymerization catalyst which is not taught or suggested by the prior art and achieves unexpected beneficial results; the process claimed therefore meets the requirements for patentability. 35 U.S.C. §§ 101–103.

2. Where the prior art teaches the necessity, as a practical matter, for using an activator in a catalyst system involving titanium tetrachloride and a sodium dispersion, the discovery of a process wherein the activator element of the catalyst combination may be omitted entirely and which unexpectedly results in greatly increased yields over the prior art is patentable.

3. The disclosures of the prior art that a small amount of polymer can be obtained without an activator does not suggest to an ordinarily skilled chemist that the activator may be omitted entirely, and a greatly increased yield obtained, through the use of a dispersion of a critical particle size.

4. The discovery that the activator element may be omitted entirely, such discovery resulting from the fortuitous supply of a sodium dispersion of the three micron maximum particle size now known to be critical, does not deprive the discoverer of the right to obtain a patent, since "[p]atentability shall not be negatived by the manner in which the invention was made." 35 U.S.C. § 103.

5. It is well established that catalytic activity is not easily predictable, although advances in chemical knowledge make more predictability in this field possible today than was possible forty years ago. Cf. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 368–369, 48 S.Ct. 380, 72 L.Ed. 610 (1928) with Hedman et al. v. Commissioner of Patents, 253 F.Supp. 515 (D.C.D.C. 1966).

6. Since the differences between the subject matter of the claims in suit and the prior art cited by defendant are not such that the claimed subject matter as a whole would have been obvious at the time plaintiffs' invention was made to a person having ordinary skill in the polymer art, the plaintiffs are entitled to a patent containing claims 13 through 16 of their application, Serial No. 722,655 filed March 20, 1958. 35 U.S.C. §§ 103, 145.

