57 CCPA

James Robert BETHELL and David James Hadley, Appellants,

v.

Theodore Augur KOCH, Ivan Maxwell Robinson and William Lee Wiley, Appellees.

Patent Appeal No. 8260.

United States Court of Customs and Patent Appeals.

July 2, 1970.

Lorimer P. Brooks, Alfred L. Haffner, Jr., New York City, attorneys of record, for appellants.

Robert E. Patridge, A. Newton Huff, Wilmington, Del., for appellees. James T. Corle, Arlington, Va., of counsel.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and McMANUS, Chief Judge, Northern District of Iowa, sitting by designation.

RICH, Judge.

This appeal is from the decision of the Board of Patent Interferences [1] awarding priority to Koch, Robinson, and Wiley (hereinafter "Koch") in interference No. 94,068, involving Koch patent 3,087,964, for "Vapor Phase Oxidation of Acrolein to Acrylic Acid," issued April 30, 1963, on application serial No. 815,320, filed May 25, 1959, and Bethell and Hadley (hereinafter "Bethell") application serial No. 4,221, filed January 25, 1960, entitled "Production of Unsaturated Aliphatic Aldehydes and the Corresponding acids." [2] We affirm.

### The Invention of the Counts

The invention is a process for producing acrylic acid ($CH_2$=CHCOOH) from acrolein ($CH_2$=CHCHO). The details of the process are reflected by the two counts which correspond to claims 1 and 2 of the Koch patent (emphasis ours):

1. Process for manufacturing acrylic acid from acrolein which comprises bringing acrolein in the vapor phase at a temperature of from 250°C. to 500° C. in the presence of oxygen into contact with *a catalyst consisting of molybdic oxide combined with a metal oxide from the group consisting of the oxides of cobalt and nickel*, the

---

1. Consisting of Boys, Crews, and Bailey, Examiners of Interference, opinion by Bailey.

2. The real parties in interest are E. I. du Pont de Nemours & Co., assignee of Koch, and B. P. Chemicals (U.K.) Ltd., assignee of Bethell.

atomic ratio of base metal to molybdenum being from 1:1 to 0.5:1 and thereafter separating acrylic acid from the effluent gases.

    2. Process of count 1 wherein the said acrolein is diluted with an inert diluent.

The emphasized language of count 1 is of pivotal importance in this appeal. The parties agree that our decision as to count 1 will be determinative of count 2 as well.

### Proceedings Below

The interference was declared after Bethell copied claims 1 and 2 of the Koch patent, the former being copied by Bethell in a modified form which is not of interest here.

During the motion period, Bethell was made the senior party on the basis of a British Provisional Specification 12,-881/59, filed April 15, 1959. Bethell's right to this date under 35 U.S.C. § 119 and his resulting senior-party status are not challenged here.

Koch took the testimony of the three inventors and ten other witnesses in an attempt to prove an actual reduction to practice of the invention of the count prior to Bethell's date and, alternatively, to prove conception coupled with reasonable diligence from just prior to Bethell's date until the filing of the application which matured into the patent here involved. Bethell relies on the British filing date and took no testimony.

### The Issues

There are two principal issues which we find it necessary to decide:

The first issue involves interpretation of the language of the count. Bethell contends that the requirement of "a catalyst *consisting of* molybdic oxide combined with a metal oxide from the group consisting of the oxides of cobalt and nickel" (emphasis ours) *excludes* from the scope of the count a process in which acrolein is contacted with a *three*-component "catalyst composition"

containing molybdic oxide, cobalt oxide, and *boron oxide.*

The second issue is whether Koch, prior to Bethell's date, used such a three-component composition to produce acrylic acid from acrolein.

### Interpretation of the Count

In holding that Koch had a conception and reduction to practice prior to Bethell's date by virtue of having carried out a conversion of acrolein to acrylic acid using a catalyst composition containing oxides of molybdenum, cobalt, and *boron,* the board said:

> The counts of this interference correspond to the first two of the three claims of the Koch et al. patent here involved. Claim 3 of the patent is dependent upon claim 1 (count 1 here), and is as follows:
>
>     3. Process of claim 1 wherein the catalyst contains a promoter of the class consisting of the oxides of boron, phosphorous and vanadium.
>
> We do not believe that when the counts are read in the light of claim 3, that they can reasonably be so narrowly construed as to exclude boron as a promoter in the catalyst. Moreover, we note that the Primary Examiner in his reconsideration of his decision on motion * * * stated
>
> > * * * As stated by Koch, the counts of the interference *would* (original emphasis) include the boromolybdate catalyst since it is clear from the language of the count that only the catalyst is exclusive and that the promoter was not considered to be a catalyst.

The parties agree that the language "consisting of," used on two occasions in the counts, limits the materials which may form *part of the "catalyst"* to ingredients specifically mentioned in the counts and impurities ordinarily associated therewith. The parties disagree as to the scope and meaning of the term "catalyst" as used in the counts and specifically as to whether the *boron ox-*

*ide* present in the catalyst composition used in Koch's alleged reduction to practice was or was not part of the "catalyst" in that composition. If it was not, then the process limitations are satisfied by Koch's alleged reduction to practice.

Koch contends that the counts should be construed in light of the specification and claims of the Koch patent in which they originated, that the Koch patent clearly distinguishes between the materials which make up the catalyst (i. e., oxides of molybdenum, cobalt, and nickel) and other materials such as catalyst supports and promoters [3] which may be combined with or contained in the catalyst, and that boron oxide is described in the patent as, and is in fact, a promoter rather than part of the catalyst *per se.*

Bethell contends that boron oxide in fact does not function as a promoter, that claim 3 of the Koch patent should not be considered in interpreting the count because the count is "clear and unambiguous in defining the catalyst," and that, since "Koch contends that boron in the catalyst significantly affects the properties thereof and that it is a 'promoter' in the catalyst," even the broader language "consisting *essentially* of" (emphasis added) would exclude the presence of a promoter in the catalyst citing National Distillers & Chemical Corp. v. Brenner, Comr. Patents, 255 F. Supp. 136, 149 USPQ 598 (D.C.D.C. 1966).

Thus, Koch is urging a narrow construction of "catalyst" (so that boron oxide is not encompassed by the term) which would result in a broad construction of the count as a whole, and Bethell is taking just the opposite position.

With respect to the contention that boron oxide is not a promoter, Bethell takes the position that a promoter must increase the activity of the catalyst *per se* and has submitted evidence purporting to show that boron oxide does not have such an effect in the process of the count. We are not convinced that the art significance of the term "promoter" is as restricted as Bethell suggests and, in any event, we find the just-mentioned evidence to be unpersuasive. Moreover, the Koch patent makes it clear that this term was not being used in such a limited sense (see note 3, supra).

We reject Bethell's criticism of the board's reference to Koch's dependent claim 3 in aid of determination of the meaning of "catalyst." As the record in this appeal amply demonstrates, this term as used in the art has several possible meanings and to this extent is "ambiguous."

It is thus necessary to look to the patent in which the count originated in order to determine the intended meaning of the term. As was succinctly stated in Judge Almond's dissenting opinion in McCutchen v. Oliver, 54 CCPA 756, 367 F.2d 609 (1966):

> Significant evidence, if not the best evidence, of the scope of any one claim is the language employed in other claims.

The opinion also contains the following relevant footnote:

> [1] According to Rivise and Caesar, § 56 (1940), it is a fundamental rule of count interpretation that
>
> > "It is proper to compare a count with the other claims of the interfering cases in order to find support for a particular interpretation of the count."
>
> See also Rivise and Caesar, § 67 (1940) which fully considers this rule

3. The functions of the promoters are described in the patent as follows:
   * * * these promoters act in different ways and, depending upon the particular acidic promoter employed, addition thereof *to the catalyst composition* may tend to increase the activity of the catalyst, improve the selectivity of the catalyst with respect to the oxidation of particular organic compounds, control the physical structure of the catalyst or help control the ratio of basic metal to molybdenum in the process of precipitation of the catalyst. [Emphasis added.]

and cites as authority therefor several cases of this court.

Here, as pointed out by the board, claim 3 of the patent represents strong evidence that Koch intended the term "catalyst" as used in count 1 to refer only to those components of the catalyst composition which are catalysts *per se* and intended that boron oxide, when present as a component of his catalyst composition, be considered a "promoter" rather than a "catalyst" for claim purposes.

The specification also clearly distinguishes between the materials which make up the catalyst *per se* (i. e., oxides of molybdenum, cobalt, and nickel) and other materials such as catalyst supports and promoters which may be combined with or contained in the catalyst. For example, the specification states:

> Precipitation of the *catalyst* can be carried out in the presence of heterogeneous catalyst *supports,* such as silica, alumina, silicon carbide, quartz, and other inert supports or supports capable of chemisorption. The catalyst can also be prepared by impregnation of a support followed by precipitation in situ.

> \*   \*   \*   \*   \*   \*

> Although satisfactory *catalysts* can be made from molybdenum oxide plus a basic metal oxide, it is beneficial to incorporate *an acidic promoter* with these *catalyst compositions*, the acidic promoter being preferably selected from the group consisting of the oxides of boron, phosphorous, and vanadium. [Emphasis added.]

Thus, although *"catalyst compositions"* containing catalytic components, promoters, activators, and catalyst supports are often referred to merely as "catalysts" by those skilled in the art, it is clear to us, and we think it would be clear to those skilled in the art, that Koch meant the term "catalyst" as used in the count to refer only to those components of the catalyst composition which *per se* are catalysts.

We do not see that this conclusion is in any way contrary to that reached by the court in the *National Distillers* case, supra, cited by Bethell. There the court had under consideration the following claim:

> 13. *A polymerization process consisting essentially of* polymerizing ethylene at a temperature of from about –20°C. to about 150°C. at a pressure of from about 25 to about 500 pounds per square inch with a *polymerization catalyst consisting essentially* of finely divided *sodium,* the particles of which are not substantially in excess of about 3 microns in diameter *and titanium tetrachloride.* [Emphasis added.]

A question to be decided was whether or not this claim distinguished over art showing the use of a three-component catalyst system containing finely divided sodium, titanium tetrachloride, and *an activator or promoter.* In answering this question in the affirmative, the court said:

> \*   \*   \* patentable novelty is clearly set forth in the claims as being the use, in the known process for preparing high density polyethylene, of an improved two-component *catalyst system* "consisting essentially of" (*which claim limitation excludes the possible presence of an activator or promoter as a third component*) a finely divided sodium dispersion having a critical maximum particle size of 3 microns, and titanium tetrachloride. [Emphasis added.]

From this, Bethell infers that here, since "consisting of" is the restrictive language employed, "the *counts* similarly exclude boron even if it were a 'promoter'." (Emphasis added.) We do not see any justification for this inference. It is apparent from the opinion in *National Distillers* that the applicant's discovery was that polymerization could be effected in the absence of an activator or promoter, that the applicant was employing the term "catalyst" in its broad sense, and that the court recognized that "catalyst" was there being used synonymously with "catalyst system" (see the

court's characterization of the process, supra). Moreover, we note that, in the claim there being considered, "consisting essentially of" was also used to modify the "polymerization process" as a whole, whereas here, the language "comprises" opens the claims in this respect.

■ In summary, we find that the process of the count does not exclude the possible presence of boron oxide as a promoter.

### Koch's Reduction to Practice

■ On this issue, we fully agree with, and adopt as our own, so much of the board's opinion as is now quoted:

Koch testified that he, during December of 1958, while conducting certain experiments dealing with catalytic oxidation prepared a cobalt-molybdate catalyst substantially in accordance with the teachings of Example II of Hartig patent No. 2,625,519 * * *.[4] This catalyst was then employed by him with the assistance of Pusey in a series of experiments studying the vapor phase oxidation of propylene and acrolein. The experiments involved first feeding a stream of oxygen, propylene and steam to a reactor containing the cobalt-molybdate catalyst previously prepared and then separating the effluent gases, which upon analysis by gas chromatography [were] found to contain acrylic acid. During the course of these experiments the feed was first changed to include acrolein as well as propylene as part of the initial feed, and then the propylene was eliminated resulting in a feed stream comprising acrolein, oxygen and

steam. The temperatures of the reactor during these experiments were between 300°C and 450°C. These experiments were recorded in Koch et al. Exhibit 9.

Pusey, a laboratory technician [corroborated the testimony of Koch] * *.

Wiley testified that he, during the period spanning the latter part of February to early March 1959, activated a catalyst identified as "E–16" prepared by Eifert * * *. This work was recorded in Koch et al. Exhibit 19. Wiley further testified that this catalyst was employed by him in the vapor phase oxidation of acrolein to acrylic acid, as recorded in Exhibits 21 and 22, during the latter part of March, 1959. The feeds in these experiments included an aqueous solution of acrolein and either air or oxygen [in vapor phase], and at a reaction temperature of approximately 375°C.

Derrickson, a laboratory technician, testified that he assisted Wiley and participated in the experiments recorded in Exhibits 21 and 22, although he did not know the specific composition of the catalyst employed, he testified that during the period in question they were using cobalt boromolybdate catalysts in such oxidation process.

Eifert, a chemist holding a Ph.D. degree in organic chemistry, testified that Robinson requested that he and Wiley study the vapor phase oxidation of acrolein to acrylic acid over a catalyst as described in Hartig patent No. 2,625,519 and as employed in the process of Koch et al. patent No. 3,065,264.[5] As a consequence of this request Wiley oxidized acrolein to acrylic acid in the presence of

---

4. The Hartig patent is concerned with a— * * * precipitated oxide catalyst comprising molybdenum oxide combined with a basic metal oxide fom the group consisting of the oxides of cobalt and nickel, the atomic ratio of the basic metal to molybdenum being less than 1:1, and combined with an acidic promoter from the group consisting of the oxides of boron, phosphorus and vanadium.

Example II reads in part:

* * * precipitated oxide catalyst of molybdenum oxide combined with cobalt oxide *and, as a promoter, boron oxide.*
　　* * * The atomic ratio of cobalt to molybdenum was 0.9 to 1. [Emphasis added.]

5. This patent relates to the vapor phase oxidation of *propylene* to acrylic acid using catalysts which ·are the *same as* those disclosed in the Hartig patent and in the Koch patent involved here.

steam and obtained a good yield of acrylic acid. Eifert further testified to preparing, with the assistance of his laboratory assistant, a catalyst in accordance with Example II of the Hartig patent, with which patent he was familiar, and designating the catalyst "E–13". This catalyst was employed, during the latter part of March, 1959, in an experiment in which an acrolein rich nitrogen stream mixed with oxygen was fed to a reactor and acrylic acid was obtained as the product. The produce was analyzed by gas chromatography. This experiment is recorded in Koch et al. Exhibit 23. Eifert also testified to the preparation of a catalyst identified as "E–16" by his assistant under his direct supervision in a manner identical to the preparation of the catalyst identified as "E–13", and giving a portion thereof to Wiley.

* * * We believe that the evidence, when considered in its entirety, establishes with the certainty here required, that the invention defined by the counts in issue was conceived and actually reduced to practice prior to April 15, 1959, the date to which Bethell et al. are restricted for the acts of conception and reduction to practice. * * *

* * * * * *

We are not persuaded by the Bethell et al. arguments concerning the adequacy of the analysis of the composition of the catalysts employed.[6] The witnesses, particularly Eifert, as noted above, testified that the catalyst employed in several of the experiments relied upon for the reduction to practice was prepared in accordance with Example II of the Hartig patent, with which process they were familiar. In view of the fact that the teachings of a known process were followed, we do not believe it is fatal to the establishment of an actual reduction to practice here that the catalyst formed may not have been analyzed. It is reasonable to believe that the product that was produced was one as taught by Example II of Hartig, which would be a catalyst falling within the requirements of the count. * * *

Nor are we persuaded by the Bethell et al. arguments with respect to the fact that Eifert's testimony concerning the preparation of the catalysts recorded in Exhibits 16 and 17, and the oxidation of acrolein recorded in Exhibit 23 is hearsay. Eifert testified * * * that his laboratory assistant, under his direct supervision, and he both actually participated in performing the experiments recorded in these exhibits. In our opinion, this testimony, as well as the supporting contemporaneous documents, adequately establish that the experiments, as set forth in these exhibits, were actually performed on the dates there indicated.

Since we have found that the Koch et al. evidence establishes that they had actually reduced to practice the invention

---

6. Principally, Bethell argues that an analysis was necessary to prove that the atomic ratio of cobalt to molybdenum was within the range of from 1:1 to 0.5:1 recited in the count. While we agree with the board's conclusion that it is reasonable under the circumstances to believe that the catalysts used by Koch satisfied the requirements of the count, Koch points out that in order to provoke this interference Bethell copied claim 1 of the Koch patent in a modified form as claim 18 which reads in pertinent part as follows:

* * * the atomic ratio of base metal to molybdenum being *not substantially greater than 1:1* * * *. [Emphasis added.]

The amendment in which this claim was added states in part:

The statement of atomic ratio of base metal to molybdenum also differs slightly in the above claim 18 from the wording of the claim of the patent, but here again claim 18 corresponds substantially to claim 1 in the patent.

From this it is apparent that Bethell would have us consider the ratio of base metal to molybdenum to be material only as to Koch's case. This we will not do.

We also have observed that the British Provisional Specification upon which Bethell's senior-party status is grounded makes no mention of any ratio of base metal to molybdenum. The equitable rule, "What's sauce for the goose is sauce for the gander," would therefore appear to be applicable here.

defined by the counts prior to April 15, 1959, the question of Koch et al.'s diligence need not be considered [7] * * *.

The decision of the board is affirmed.

Affirmed.

See also Cust. & Pat.App., 427 F.2d 1384.

7. The board nevertheless went on to "complete the record" by analyzing the evidence of diligence, concluding that:

* * * Koch et al. and their attorney were reasonably diligent during the critical period, that is from a time just prior to April 15, 1959 until the invention here at issue was constructively reduced to practice by the filing of their

application for a patent on May 25, 1959.